1

2

3

4

5

6                          IN THE UNITED STATES DISTRICT COURT

7

8                          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10    MARK LETELL ADAMS,                                No. C 10-04787 WHA

11              Plaintiff,

12        v.                                            **ORDER GRANTING
                                                        DEFENDANTS' MOTION FOR
13    RONALD ALBERTSON individually in                  SUMMARY JUDGMENT AND
      his official capacity as a former San Carlos      DENYING PLAINTIFF'S
14    Police Sergeant, MICHAEL ANDERSON                  MOTION FOR SUMMARY
      individually in his official capacity as a        JUDGMENT**
15    former San Carlos Police Officer, JUSTIN
      COUNCIL individually in his official
16    capacity as a former San Carlos Police
      Officer, GREG ROTHAUS individually in
17    his official capacity as a former San Carlos
      Police Chief, CITY OF SAN CARLOS,
18    CITY OF SAN CARLOS POLICE
      DEPARTMENT, and DOES 1–100,
19
                Defendants.
20    _____/

21

22                                    **INTRODUCTION**

23           In this Section 1983 action, the parties have now filed cross-motions for summary

24    judgment.  For the reasons stated below, defendants' motion for summary judgment is GRANTED

25    and plaintiff's motion for summary judgment is DENIED.

26                                     **STATEMENT**

27           This action arises from pro se plaintiff Mark Adams' arrest for domestic violence.  Many

28    of the underlying facts were memorialized in police recordings and are summarized

1   chronologically in this section.  This order makes no finding that plaintiff did (or did not) abuse

2   his spouse, it being unnecessary to the fair determination of this action.

3        **1.    PHYSICIAN'S REPORT.**

4        On the afternoon of April 23, 2010, plaintiff's spouse went to the Redwood City clinic to

5   treat an injured finger.  After determining that the finger was fractured, the treating physician

6   called the police to report suspected domestic violence.  The physician reported that plaintiff's

7   spouse said plaintiff had squeezed her hand earlier that night, around 4:00 a.m., during a

8   confrontation in which she was trying to stop him from spanking their two-year-old toddler.  The

9   physician also reported that plaintiff's spouse said plaintiff had a history of pushing and grabbing

10  and that she previously had bruises on her face from plaintiff throwing something at her (Dkt. No.

11  170 [transcript of recordings] at 23–24).

12       The spouse declaration, submitted in support of plaintiff's opposition, disputes the

13  physician's account of events.  The declaration states that she and the physician had trouble

14  communicating about how the injury occurred:  "I was not completely sure how [the injury]

15  happened but I think it occurred during the early mornings hours at 4:00 am in my bedroom"

16  (Teresa Adams Decl. ¶¶ 5–6).  The spouse declaration also states that she "was only able to offer

17  assumptions about what might have happened" to the physician (Teresa Adams Decl. ¶ 6).

18  Notably, the declaration does not deny that plaintiff grabbed her finger or that the injury was the

19  result of plaintiff's force.  At the motion hearing herein, plaintiff argued that his spouse did not

20  tell the physician that it was domestic violence.

21       The physician's report was relayed to defendant Officer Ronald Albertson.  Officer

22  Albertson recognized plaintiff's name because he had assisted in a custody dispute between

23  plaintiff and plaintiff's ex-girlfriend (Albertson Decl. ¶¶ 2–4).  Officer Albertson also knew that

24  the police department had responded to two prior calls involving plaintiff in 2009 and that

25  plaintiff had complained about the police response each time (Albertson Decl. ¶ 5).  These calls

26  had occurred in 2009 and had not resulted in any arrest or charges against plaintiff (Robbins Decl.

27  ¶¶ 2–6).  None of the named officers in this action had been involved in these earlier calls

28  (Albertson Decl. ¶ 5, Council Decl. ¶ 11, Rothaus Decl. ¶ 4, Anderson Decl. ¶ 31).

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    Officer Albertson told the dispatcher that any involvement of plaintiff would have been a

2    "problem" (Dkt. No. 170 at 26). Believing that plaintiff would have complained again, Officer

3    Albertson decided to speak with the reporting doctor personally before going to the plaintiff

4    residence (Alberston Decl. ¶ 6).

5    During their recorded conversation, the treating physician told Officer Alberston the

6    following. It was her first time seeing plaintiff's spouse, who told her that plaintiff had spanked

7    their two-year old "kind of violently" and that he had squeezed her hand (the spouse's hand)

8    when she was trying to stop him. Plaintiff's spouse had a fractured left middle finger. Plaintiff's

9    spouse said that plaintiff had a history of pushing her and had thrown things at her in the past.

10   The spouse, however, "didn't feel that she was in imminent danger." The physician said to the

11   spouse that she needed to report the incident as a mandatory reporter. Plaintiff's spouse did not

12   wanted the incident reported but acknowledged that plaintiff had anger issues (Dkt. No. 170

13   at 31).

14        **2.     OFFICER RESPONSE TO THE PLAINTIFF RESIDENCE.**

15   Defendant Officers Albertson, Michael Anderson, and Justin Council drove to plaintiff's

16   residence at approximately 3:20 p.m. that day in police uniforms (Albertson Decl. ¶ 11). Officer

17   Anderson rang the front doorbell. Plaintiff's spouse opened the door and identified herself.

18   Officer Anderson asked if he could come in. She responded in a soft whisper by asking if the

19   officers could come back in a half hour because "he" was about to leave (Anderson Decl. ¶ 7).

20   She seemed very nervous and timid (Anderson Decl. ¶ 7, Albertson Decl. ¶ 12). Officer

21   Anderson turned away to speak with Officer Albertson about what plaintiff's spouse had just

22   whispered. Officer Albertson told him that they could not leave without conducting a welfare

23   check. After Officer Anderson turned back to the front door, plaintiff's spouse was no longer

24   standing at the door. He then called out for her by saying "ma'am?" Then, plaintiff, himself,

25   responded to the front door and asked "what's up?" Officer Anderson asked plaintiff if he could

26   come outside and talk. Plaintiff voluntarily stepped outside. Officer Anderson then opened the

27   screen door to the residence (Dkt. No. 170 at 35–36; Anderson Decl. ¶ 8). These facts are not

28   disputed.

How Officer Anderson next entered the house is disputed but is ultimately not material. According the Officer Anderson's declaration, plaintiff's spouse returned to the front door. He then asked her if he could talk to her for a minute. She responded yes and took steps back deeper into the residence to an area where plaintiff could not hear her. Officer Anderson's declaration states that he interpreted this conduct as leading him and followed into her into the residence (Anderson Decl. ¶ 8). According to the spouse declaration, however, Officer Anderson walked inside the house *before* she came back to the front door (Teresa Adams Decl. ¶ 2).

The next part is undisputed. Once inside, Officer Anderson conducted a welfare check on plaintiff's spouse and her child. Immediately after entering, Officer Anderson asked if the toddler was okay and told plaintiff's spouse that he needed to check the toddler for injuries. The toddler did not have any signs of injury. Officer Anderson then spoke with plaintiff's spouse in the living room, away from the others (Anderson Decl. ¶ 8). She told Officer Anderson that her finger was in pain and that it was difficult to bend. She told him that plaintiff had spanked the toddler because the toddler was not falling asleep last night. She had tried to pull plaintiff away by grabbing his hands. Plaintiff had responded by squeezing her hand. When asked why plaintiff had squeezed her hand, plaintiff's spouse said that plaintiff had tried to pull her off him and had pushed her away. Plaintiff had told her to "back off" (Dkt. No. 170 at 37–45). Without prompting, plaintiff's spouse showed Officer Anderson another injury she received from being pushed by plaintiff and falling down on the floor. Plaintiff's spouse lifted the back of her shirt and showed Officer Anderson various marks and bruising on her back from the push. She referred to it as a "weird bruise" and that it hurt after she had been pushed (Anderson Decl. ¶ 14; Dkt. No. 170 at 46). The spouse declaration, filed in support of plaintiff's opposition, states that she "felt intimidated by [Officer Anderson's] authority and . . . just did whatever he told me to do" (Teresa Adams Decl. ¶ 3).

### 3.   ARREST.

After speaking with plaintiff's spouse, Officer Anderson went outside to speak with plaintiff. He was not handcuffed at the time. After Officer Anderson explained that they were investigating an incident reported by the hospital, plaintiff began to describe his version of the

4

United States District Court

For the Northern District of California

1   events that led to his spouse's injury.  Plaintiff stated that he had spanked the toddler on the leg

2   because the toddler had kept "wrestling around a bit."  Plaintiff's spouse had become upset

3   because she thought he was harming their child.  Plaintiff's spouse had tried to grab the toddler,

4   so he put his arm out to stop her.  She had "tussled" with him, so he pushed her and told her not to

5   interfere.  Plaintiff denied being struck by his spouse or suffering any injuries.  Plaintiff admitted

6   that his spouse may have fallen down during the altercation.  Up until then, no *Miranda* warnings

7   were given (Dkt. No. 170 at 48–49).

8       Officer Anderson placed plaintiff under arrest for domestic violence.  Officer Anderson

9   explained to him that because his spouse had visible injuries caused by a physical altercation, he

10  was required to make the arrest.  Plaintiff was placed in handcuffs without incident (Dkt. No. 170

11  at 50–52).  Officer Anderson also requested an emergency protective order for plaintiff's spouse

12  and the toddler (Anderson Decl. Exh. D).  Officer Council transported plaintiff to the San Carlos

13  police department.

14      Officer Anderson met with plaintiff at the police department to serve him with the

15  protective order, to transport him to San Mateo County Jail, and to read him his *Miranda* rights.

16  As plaintiff correctly argued in his briefs and at the hearing, his *Miranda* rights had not been read

17  to him prior to then.  Plaintiff told Officer Anderson that he would need his heart medication.

18  Officer Anderson explained that once he was booked at the county jail, plaintiff would have the

19  opportunity to let the jail nurse know about his medication.  Plaintiff also asked about a telephone

20  call.  Officer Anderson told him that he would be able to make calls once he was booked at the

21  jail (Dkt. No. 170 at 74–85).

22      Plaintiff was booked at 6:10 p.m., within three hours of his initial arrest (Anderson Decl. ¶

23  30).  Plaintiff was released seven hours later that night.  Plaintiff's spouse did not file a domestic

24  violence complaint, and plaintiff was not prosecuted.  He then filed and litigated a motion for a

25  judicial finding of factual innocence in state court.  That motion was denied.

26      In his Section 1983 complaint herein, plaintiff alleges (1) unlawful search, (2) unlawful

27  detainment and interrogation, (3) deprivation of due process, (4) defamation and false statements,

28  (5) conspiracy, and (6) interference with family relationships.  Plaintiff seeks compensatory and

United States District Court

For the Northern District of California

1   punitive damages.  Now, defendants and plaintiff have filed cross-motions for summary judgment

2   on all claims.

3                                            **ANALYSIS**

4          Summary judgment is proper when the "pleadings, depositions, answers to interrogatories,

5   and admissions on file, together with the affidavits, show that there is no genuine issue as to any

6   material fact and that the moving party is entitled to judgment as a matter of law."  FRCP 56(c).

7   An issue is genuine only if there is sufficient evidence for a reasonable fact-finder to find for the

8   non-moving party, and material only if the fact may affect the outcome of the case.  *Anderson v.*

9   *Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

10         To state a claim under Section 1983, a plaintiff must allege two essential elements:  (1)

11  that a right secured by the Constitution or laws of the United States was violated, and (2) that the

12  alleged violation was committed by a person acting under the color of state law.  *Long v. County*

13  *of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

14         A two-step inquiry is required when a police officer asserts qualified immunity.  The first

15  question is whether "the officer's conduct violated a constitutional right."  The second question is

16  whether the right was "clearly established."  In determining whether a right was "clearly

17  established," the court considers whether it would have been clear to a reasonable officer that his

18  conduct was unlawful in the situation he confronted.  *Garcia v. County of Merced*, 639 F.3d 1206,

19  1208 (9th Cir. 2011).  Whether qualified immunity applies is a pure legal question.  However,

20  where there are factual disputes as to the parties' conduct or motives, the case cannot be resolved

21  at summary judgment on qualified immunity grounds.  *See Serrano v. Francis*, 345 F.3d 1071,

22  1077–80 (9th Cir. 2003).

23         **1.      WARRANTLESS ENTRY INTO THE RESIDENCE.**

24         Absent consent, there are two general exceptions to the warrant requirement for home

25  searches:  emergency and exigency.  The emergency exception allows officers to respond to

26  emergency situations that threaten life or limb.  The exigency exception allows officers to enter a

27  home without a warrant if they have both probable cause to believe that a crime has been or is

28  being committed and a reasonable belief that their entry is necessary to prevent the destruction of

                                                6

relevant evidence, the escape of the suspect, or the improper frustration of legitimate law enforcement efforts. *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009).

In determining civil liability through the lens of qualified immunity in a Section 1983 action, the Supreme Court recently held that police officers may enter a residence without a warrant when they have an objectively reasonable basis for believing that an occupant is imminently threatened with serious injury. Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving." *Ryburn v. Huff*, — U.S. —, 2012 WL 171121 at *3–5 (2012).

As plaintiff correctly argued in his brief and at the hearing, there is a genuine factual dispute over whether his spouse met Officer Anderson at the front door and motioned him in or whether Officer Anderson entered the house before plaintiff's spouse went back to the front door. Thus, consent cannot be a basis for the warrantless entry.

There is no genuine factual dispute, however, over what the physician reported. Defendants have submitted a recording and transcript of the conversation. Based on the physician's statements and events at plaintiff's residence prior to the entry, it was reasonable for defendant officers to enter the house to check on the welfare of plaintiff's spouse and the toddler. The physician reported that plaintiff's spouse said that plaintiff had "squeezed [his spouse's] hand so hard" as to cause a bone fracture. Plaintiff's spouse said that plaintiff had "anger issues" and a history of pushing her and throwing things at her (Dkt. No. 170 at 31). Plaintiff had spanked his two-year-old toddler "kind of violently." And plaintiff had spanked the toddler violently enough for plaintiff's spouse to intervene. After speaking with the physician, Officer Albertson relayed this information to Officer Anderson and immediately drove to check on plaintiff's spouse and the toddler (Anderson Decl. ¶ 3; Albertson Decl. ¶ 11).

In his briefs and at the hearing, plaintiff argued that the physician exaggerated the extent of his spouse's harm and had failed to obtain consent for an examination for domestic violence evidence. Even if true, this argument misses the point. The physician is not a defendant. The

7

United States District Court

For the Northern District of California

1   issue is whether the police officers reasonably relied on the statements of the physician to

2   investigate the domestic violence incident.  Having reviewed the record, this order finds that they

3   did.

4         Plaintiff also argues that the physician violated his spouse's HIPAA rights by reporting

5   the suspicion of domestic violence.  This argument is wrong.  HIPAA regulations expressly

6   permit a physician to report suspicion of domestic violence to the extent required by law.  45

7   C.F.R. 164.512(c)(1)(i), (iii).  The physician was a mandatory reporter under California Penal

8   Code Section 11160.

9         There is no genuine dispute about the events at the plaintiff's front porch prior to Officer

10  Anderson's entry into the house.  Officer Anderson's declaration states that plaintiff's spouse

11  looked timid and nervous and that she told him to come back when plaintiff was not at home.[1]

12  Plaintiff then saw the officers at his front door when Officer Anderson called for the spouse.  The

13  spouse declaration does not dispute this account of events.

14        Domestic disputes have a "combustible nature."  "A potential victim . . . may fear that by

15  complaining to police, he or she might expose himself or herself to likely future harm at the hands

16  of a hostile aggressor who may remain unrestrained by the law."  Thus, it was reasonable for the

17  officers to think that if they left after being seen by plaintiff, he might have physically retaliated

18  against his spouse for reporting him (Anderson Decl. ¶ 8).  This is especially true here, where

19  plaintiff's spouse had initially whispered to Officer Anderson that they should come back in 30

20  minutes after "he" left.  Officer Anderson reasonably interpreted this as her fear that if plaintiff

21  knew of the officers' presence, he would retaliate against her for reporting her injuries.  The fact

22  that plaintiff's spouse told the officers to come back does not take away from the immediacy of

23  the danger because it is "very common for victims of domestic abuse initially to deny that they

24  had been assaulted . . . especially when the abuser is present."  *United States v. Brooks*, 367 F.3d

25  1128, 1134–38 (9th Cir. 2004).  It may be true that before they went to the house, the officers had

26  adequate time to get a warrant.  However, once the officers arrived at the house and were seen by

27  plaintiff, exigency circumstances then independently developed.  Up to the point that exigent

28

      [1] This statement was inaudible in Officer Anderson's audio recording of the events.

circumstances developed, the officers had made no entry and had violated no constitutional rights. Once the exigent circumstances presented themselves, there was no time to return for a warrant and the officers acted prudently and constitutionally in entering to prevent perceived imminent harm to the spouse.

Our court of appeals has also held that the suspected abuse of a child may justify a warrantless entry.  In one decision, officers were dispatched to investigate a report from child protective services that a seven-year-old child had been seen playing in his yard without a shirt on and with severe welts on his back.  Upon arrival at the home, officers told the father of the reported child abuse and asked to examine his son, who could be seen from the doorway.  The father refused to allow the officers to examine his son without a warrant or court order.  The child attempted to show the officers his back, but the father ordered him not to and to go to another room.  The officers insisted on examining the child and the father became violent and abusive and responded with extreme profanity and insults.  Our court of appeals held that a warrantless entry in that situation was not a constitutional violation.  *White by White v. Pierce County*, 797 F.2d 812, 813 (9th Cir. 1986).

Here, the defendant officers were told that the two-year-old toddler had been spanked "kind of violently" and that the mother had been severely injured when trying to stop the spanking.  Based on the physician's statements and the events prior to entering the plaintiff residence, this order finds that there was a reasonable basis for Officer Anderson to enter the house to respond to an emergency situation.  No reasonable juror could find otherwise.  Plaintiff's claim of a Fourth Amendment violation fails.

Alternatively, this order finds that Officer Anderson is entitled to qualified immunity because it would not have been be clear to a reasonable officer that his conduct was unlawful in the situation at issue.  Based on the undisputed facts, a police officer could have reasonably believed that he was justified in making a warrantless entry to ensure that no one inside the house was imminently threatened with serious injury.

Plaintiff argues that there was no immediate danger of harm.  The reporting physician reported that plaintiff's spouse did not feel like she was in imminent danger.  The reported

9

United States District Court

For the Northern District of California

1    spanking and finger fracturing took place several hours before the entry. Plaintiff's spouse was

2    able to visit the hospital herself the morning after the injury and did not report to the physician

3    that she or her toddler was in immediate danger. Defendants do not dispute these facts. As

4    argued by plaintiff during the hearing, these facts do reduce the urgency of a warrantless entry.

5    Nevertheless, for the reasons stated, the undisputed facts lead to only one plausible conclusion:

6    there was a reasonable basis for Officer Anderson to enter the house to respond to an emergency

7    situation.

8              **2.    *MIRANDA* WARNINGS.**

9         *Miranda* warnings are required only where there has been such a restriction on a person's

10    freedom as to render him in custody. The underlying question of custody is whether there was a

11    restraint on freedom of movement the degree associated with a formal arrest, under the totality

12    of the circumstances that might affect how a reasonable person in that position would perceive his

13    or her freedom to leave. *Stanley v. Schriro*, 598 F.3d 612, 618 (9th Cir. 2010).

14         Based on the undisputed underlying facts, no reasonable person in plaintiff's situation

15    would have perceived that he was in custody prior to his arrest. There was not a restraint on

16    plaintiff's freedom of movement of the degree associated with a formal arrest.

17         Officer Anderson *asked* plaintiff to talk with officers on his front porch: "you wanna hang

18    out with him for just a second?" Officer Anderson did not command plaintiff to do so. Plaintiff

19    voluntarily complied. While Officer Anderson was checking on plaintiff's spouse and the

20    toddler, plaintiff and Officer Albertson had a conversation on his porch. Having reviewed the

21    recording and transcript, this order finds that there were no comments made by Officer Albertson

22    that would have led a reasonable person to believe that he would not have been free to leave.

23    Plaintiff and Officer Albertson conversed about local politics and plaintiff was comfortable

24    enough to direct the conversation and greet a passing neighbor (Dkt. No. 170 at 58–62).

25         Defendants did not intimidate plaintiff with strong evidence of guilt before plaintiff

26    voluntarily gave his account of the events of the night at issue. Officer Anderson told plaintiff

27    that "the reason why we're here is because we're investigation an incident that occurred last

28    night. Okay? I guess your wife went to the hospital and, uh, the hospital called us. . . . . can you

10

tell me what happened last night?" (Dkt. No. 170 at 48). The physical surroundings were not intimidating because the questioning occurred on plaintiff's front porch. The duration of the discussion was not long because plaintiff was only talking with the officers for approximately 20 minutes before being arrested. Having reviewed the recording and transcript of the conversation between plaintiff and the officers, this order finds that the degree of pressure applied to plaintiff was minimal. Plaintiff was not in custody for the purposes of *Miranda*. No reasonable juror could find otherwise.

Plaintiff argued in his brief and at the hearing that he was in constructive custody because Officers Albertson and Council were "flanking" him (Dkt. No. 171 at 17). Plaintiff also argued that he felt unable to leave. Plaintiff's conclusory assertion that he felt unable to leave from his own front yard is insufficient to show that an objectively reasonable person in his situation would have felt the same way.

### 3.     ARREST.

California's domestic violence statute states that "[a]ny person who willfully inflicts upon a person who is his or her spouse . . . corporal injury resulting in a traumatic condition, is guilty of a felony." CAL. PENAL CODE 273.5. Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. All that is required is a "fair probability," given the totality of the evidence. *Garcia v. County of Merced*, 639 F.3d 1206, 1209 (9th Cir. 2011).

Even considering the record in the light most favorable to plaintiff, this order concludes that Officer Anderson reasonably determined that there was probable cause to arrest plaintiff. Before making the arrest, Officer Anderson had acquired the following facts. *First*, a medical doctor who examined plaintiff's spouse that day relayed the existence of a fractured finger, caused by plaintiff. *Second*, an interview of plaintiff's spouse confirmed that plaintiff squeezed her finger, causing swelling, and she was pushed to the floor, causing bruising on her back. *Third*, Officer Anderson was able to visually verify the existence of bruises on her back and swelling of the fractured finger. *Fourth*, plaintiff admitted that there was a "tussle," that he

11

United States District Court

For the Northern District of California

1    "pushed" his spouse, and that she "might have fallen down."  There is no genuine dispute over

2    these facts because they have been memorialized in recordings and photographs.  Based on the

3    statements of the physician, plaintiff's spouse, and plaintiff, and the physical examination, Officer

4    Anderson had sufficient information to lead a person of reasonable caution to believe that an

5    offense had been committed by plaintiff.  No reasonable juror could find otherwise.

6           **4.     HEART MEDICATION.**

7           Plaintiff alleged "deliberate indifference" to his "substantive due process rights and no

8    provision allowed of daily medication to treat a potentially life threatening heart condition despite

9    repeated request [sic]" (Second Amd. Compl. ¶ 40).  The deliberate indifference standard applies

10   to due process claims that facility officials failed to address the medical needs of a pretrial

11   detainee.  A plaintiff must show that the official was "(a) subjectively aware of the serious

12   medical need and (b) failed adequately to respond."  *Simmons v. Navajo County*, 609 F.3d 1011,

13   1017–18 (9th Cir. 2010).

14          Plaintiff fails to submit sufficient evidence to show that Officer Anderson, or any other

15   official, was subjectively aware of a serious heart condition and failed to adequately respond.

16   Although plaintiff told Officer Anderson that he took heart medication, plaintiff did not tell

17   Officer Anderson the seriousness of the condition or the urgency of taking the medication.

18   Indeed, it was revealed during his deposition that plaintiff took the medication once at night and

19   even though he was only in custody for less than a day, he did not take his heart medication for

20   four to five days after his arrest (Adams Dep. at 103:7–15).  This shows that there was not a

21   serious medical need to take the medication at a particular time without delay.  Plaintiff also fails

22   to show that Officer Anderson's response to his request for medication was inadequate.  Officer

23   Anderson told plaintiff that he could request medication from the nurse at the San Mateo County

24   Jail and then immediately drove plaintiff to the jail.  Plaintiff was arrested at 3:44 p.m. and

25   booked at the County Jail at 6:10 p.m. (Anderson Decl. ¶¶ 20, 30).

26          **5.     TELEPHONE CALL.**

27          The Fourteenth Amendment provides an arrestee with a right to communicate with the

28   outside world.  The process provided by the California Penal Code Section 851.5, which allowed

United States District Court

For the Northern District of California

1   for an arrestee to make three phone calls within three hours of being arrested, is sufficient to

2   satisfy due process. *Carlo v. City of Chino*, 105 F.3d 493, 496–97 (9th Cir. 1997).

3       Here, defendants did not violate the California penal code and thus, did not violate

4   plaintiff's Fourteenth Amendment rights.  Plaintiff was arrested at 3:44 p.m. and booked at the

5   County Jail at 6:10 p.m. (Anderson Decl. ¶¶ 20, 30).  Therefore, plaintiff was no longer in

6   defendants' custody when his right to a telephone call matured under the California penal code.

7   Plaintiff does not submit any evidence to suggest that he urgently needed to place a phone call

8   between the time of his arrest and being transferred to County Jail.  The undisputed facts show

9   that defendants did not violate plaintiff's constitutional right to a phone call.

10      **6.      RACIAL DISCRIMINATION.**

11      Plaintiff alleged that the individual defendant officers, city, and police department had "a

12   pattern and practice of racially profiling in a manner amounting to selective prosecution in

13   violation of the Equal Protection requirements" (Second Amd. Compl. ¶ 15).

14      To prevail on his claim under the Equal Protection Clause, a plaintiff must demonstrate

15   that enforcement had a discriminatory effect and the police were motivated by a discriminatory

16   purpose.  To establish a discriminatory effect, the claimant must show that similarly situated

17   individuals were not prosecuted.  To show discriminatory purpose, the claimant must establish

18   that the decision-maker selected or reaffirmed a particular course of action at least in part because

19   of its adverse effects upon an identifiable group. *Rosenbaum v. City & County of San Francisco*,

20   484 F.3d 1142, 1153 (9th Cir. 2007).

21      Municipalities and its police departments may not be held liable under Section 1983

22   unless the discriminatory action was made pursuant to official municipal policy or governmental

23   custom even though such custom has not received formal approval.  Proof of random acts or

24   isolated events is insufficient to establish custom. *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir.

25   1995).

26      The only evidence plaintiff submits to support his racial discrimination claims are the

27   police department's "Study Session on Police Services and Results of Recent Benchmarking

28   Survey" (Dkt. No. 174-3), and the department's arrest statistics for unlicensed drivers (Dkt.

1   No. 196-5).  The first document is facially neutral and there is no evidence that there has been

2   selective enforcement based on race.  The arrest data seemingly skews towards more arrests for

3   Latino drivers.  However, this does not show bias towards plaintiff, an African American.  This

4   evidence is insufficient to suggest that the police department had a discriminatory policy or

5   custom that led to plaintiff's arrest.  No reasonable juror could find otherwise.

6          Plaintiff argues that Officer Albertson's statement, "this is a problem," when first learning

7   that plaintiff was involved in the reported domestic violence, suggests that Officer Albertson

8   targeted plaintiff because of his race.  This order disagrees.  As Officer Albertson explained, he

9   was previously involved in a custody dispute involving plaintiff and was aware that plaintiff made

10  previous complaints about police encounters (Albertson Decl. ¶¶ 4–6).  Officer Albertson's "this

11  is a problem" comment likely meant that plaintiff would file another complaint against the police

12  after this encounter.  Which in fact plaintiff did.  No reasonable jury could find that the phrase,

13  "this is a problem," suggested that Officer Albertson was targeting plaintiff because of his race.

14          **7.    RETALIATION CLAIM.**

15         Plaintiff alleged that the defendants arrested him in retaliation for his prior complaints of

16  police action (Second Amd. Compl. ¶ 16).  The plaintiff in a retaliatory arrest claim must prove

17  the elements of retaliatory animus as the cause of injury, and the defendant will have the same

18  opportunity to respond to a prima facie case by showing that the action would have been taken

19  anyway, independently of any retaliatory animus.  *Hartman v. Moore*, 547 U.S. 250, 261–65

20  (2006).

21         Although Officer Albertson was aware that plaintiff complained about police conduct in

22  the past, there is no evidence to suggest that plaintiff was arrested because of his prior complaints.

23  Indeed, it was Officer Anderson who made the decision to arrest after talking with and inspecting

24  plaintiff's spouse.  There is no evidence that Officer Anderson was aware of plaintiff's prior

25  complaints about police conduct.  Moreover, as discussed, there was probable cause for the arrest

26  irrespective of any retaliatory animus.

27

28

**8.    FAMILY INTERFERENCE CLAIM.**

Plaintiff argues that defendants interfered with his parental rights by requesting an emergency protective order, which kept plaintiff apart from his child for seven days.  To claim that an officer's conduct interfered with the right of family unity in violation of substantive due process, the plaintiff must show that the conduct was "conscience-shocking" and exemplified "the most egregious official conduct." *Brittain v. Hansen*, 451 F.3d 982, 996 (9th Cir. 2006).  As discussed, defendants had probable cause to arrest plaintiff.  These same considerations warranted the request of an emergency protective order.  This conduct was not conscience-shocking or egregious official conduct.

**9.    DEFAMATION.**

Plaintiff also argues that the officers made false statements in their police reports.  Under California law, a publication "must contain a false statement of fact to give rise to liability for defamation." *Campanelli v. Regents of University of California*, 44 Cal. App. 4th 572, 578 (1996).  To claim harm to one's reputation under Section 1983, plaintiff must show that the injury to his reputation was inflicted in connection with the deprivation of a federally protected right and the injury to reputation caused the denial of a federally protected right. *Hart v. Parks*, 450 F.3d 1059, 1070 (9th Cir. 2006).

Having reviewed the record, this order finds that defendants' police reports did not contain false facts.  Any reputation harm from the arrest was not connected to a wrongful deprivation of a federally protected right because, as discussed, the police had probable cause to arrest plaintiff.

**10.    CONSPIRACY.**

Plaintiff's conspiracy claim relies on his allegations of civil rights violations.  To prove a conspiracy under Section 1983, plaintiff must show an agreement or meeting of the minds to violate constitutional rights. *Hart*, 450 F.3d at 1069.  As discussed, defendants did not violate plaintiff's rights.  There is no factual evidence that defendants conspired to violate plaintiff's rights.

15

**11.    ATTORNEY'S FEES**.

Defendants request attorney's fees on the argument that this action was frivolous and meritless. "The mere fact that a defendant prevails does not automatically support an award of fees. A prevailing civil rights defendant should be awarded attorney's fees not routinely, not simply because [the defendant] succeeds, but only where the action brought is found to be unreasonable, frivolous, meritless, or vexatious." *Patton v. County of Kings*, 857 F.2d 1379, 1381 (9th Cir. 1988). The rule against awarding defendants attorney's fees applies with special force where the plaintiffs are pro se litigants. *See Hughes v. Rowe*, 449 U.S. 5, 15 (1980). Given plaintiff's pro se status, attorney's fees are not awarded.

## CONCLUSION

For the reasons stated, defendants' motion for summary judgment is **GRANTED** and plaintiff's motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

Dated:   February 10, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California

16